IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

United States of America,     ) Criminal Action
                           ) No. 21-cr-00040-TNM
               Plaintiff,  )
                           )
vs.                      ) **Status Conference**
                           )
Patrick Edward McCaughey,  )
III, et al.,             ) Washington, D.C.
                         ) October 4, 2021
               Defendants.  ) Time:  4:30 p.m.

_____

Transcript of **Status Conference**
Held Before
The Honorable Trevor N. McFadden
United States District Judge

_____

A P P E A R A N C E S

For the Government:     **Jocelyn P. Bond**
                        **Melissa J. Jackson**
                        **Kimberley C. Nielsen**
                        UNITED STATES ATTORNEY'S OFFICE
                        FOR THE DISTRICT OF COLUMBIA
                        555 Fourth Street, Northwest
                        Washington, D.C. 20001

For the Defendant (1) Patrick Edward McCaughey, III:
                        **Lindy R. Urso**
                        LINDY R. URSO, ATTORNEY AT LAW
                        810 Bedford Street, Suite 3
                        Stamford, Connecticut 06901

For the Defendant (2) Tristan Chandler Stevens:
                        **Lauren Cobb**
                        OFFICE OF THE FEDERAL DEFENDER
                        FOR THE NORTHERN DISTRICT OF FLORIDA
                        3 West Garden Street, Suite 200
                        Pensacola, Florida 32502

For the Defendant (3) David Lee Judd:
                        **Elizabeth A. Mullin**
                        OFFICE OF THE FEDERAL PUBLIC DEFENDER
                        1650 King Street, Suite 500
                        Alexandria, Virginia 22314

For the Defendant (4) Christopher Joseph Quaglin:
                    **Steven A. Metcalf II**
                    METCALF & METCALF, P.C.
                    99 Park Avenue, Suite 2501
                    New York, New York 10016

For the Defendant (5) Robert Morss:
                    **Elizabeth L. Toplin**
                    **Kathleen M. Gaughan**
                    FEDERAL COMMUNITY DEFENDER OFFICE,
                    EASTERN DISTRICT OF PENNSYLVANIA
                    601 Walnut Street, Suite 540 West
                    Philadelphia, Pennsylvania 19106

For the Defendant (6) Geoffrey William Sills:
                    **Marc Massey**

For the Defendant (7) David Mehaffie:
                    **Eugene Ohm**
                    FEDERAL PUBLIC DEFENDER FOR THE
                    DISTRICT OF COLUMBIA
                    625 Indiana Avenue, Northwest
                    Washington, D.C. 20004

For the Defendant (8) Steven Cappuccio:
                    **Marina T. Douenat**
                    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                    WESTERN DISTRICT OF TEXAS
                    727 César E. Chávez Boulevard
                    San Antonio, Texas 78206

For the Defendant (9) Federico Guillermo Klein:
                    **Stanley E. Woodward, Jr.**
                    BRAND WOODWARD LAW
                    1808 Park Road, Northwest
                    Washington, D.C. 20010

Also Present:       Masharia Holman, Pretrial Services
                    Officer

_____

Stenographic Official Court Reporter:
                    Nancy J. Meyer
                    Registered Diplomate Reporter
                    Certified Realtime Reporter
                    333 Constitution Avenue, Northwest
                    Washington, D.C. 20001
                    202-354-3118

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Your Honor, this is Criminal Case 21-40.  United States of America v. McCaughey, et al.  From pretrial, Shay Holman.

Counsel, please come forward to identify yourselves for the record, starting with the government.

MS. JACKSON:  Good afternoon.  AUSA Melissa Jackson on behalf of the United States of America.

THE COURT:  Good afternoon, Ms. Jackson.

MS. NIELSEN:  Good afternoon, Your Honor.  Kimberly Nielsen on behalf of the government.

THE COURT:  Good afternoon, Ms. Nielsen.

MS. BOND:  Jocelyn Bond on behalf of the United States.

THE COURT:  Good afternoon, Ms. Bond.

MR. URSO:  Good afternoon, Your Honor.  Lindy Urso of behalf of Mr. McCaughey.

THE COURT:  Good afternoon, Mr. Bond [sic].  And where's your client, Mr. -- oh.  Good afternoon, Mr. Urso.  Good afternoon, Mr. McCaughey.

MS. COBB:  Your Honor, Lauren Cobb.  I'm here for Tristan Stevens, who's present.

THE COURT:  Good afternoon, Mr. Stevens.  Good afternoon, Ms. Cobb.

MS. COBB:  Thank you.

MS. MULLIN:  Good afternoon, Your Honor.  Elizabeth Mullin.  I'm here for David Judd, who is present.

THE COURT:  Good afternoon, Mr. Mullin -- or Ms. Mullin.  Good afternoon, Mr. Judd.

MR. MASSEY:  Good afternoon, Your Honor.  Marc Massey, standing in for John Kiyonaga, on behalf of Mr. Sills, who's present.

THE COURT:  Say that one more time, sir.

MR. MASSEY:  Marc Massey.

THE COURT:  Oh, good afternoon, Mr. Massey.

MR. MASSEY:  Good afternoon.

THE COURT:  And good afternoon, Mr. --

MR. MASSEY:  Sills.

THE COURT:  -- Sills.

MS. TOPLIN:  Good afternoon, Your Honor.  Elizabeth Toplin and Kathleen Gaughan on behalf of Mr. Morss, who's present in the jury box.

THE COURT:  Good afternoon, ladies, and good afternoon, Mr. Morss.

MR. METCALF:  Good afternoon, Your Honor.  Steven Metcalf on behalf of Joseph McBride.  I'm also on behalf of Christopher Quaglin, who is present.

THE COURT:  Okay.  Good afternoon, Mr. Metcalf, and good afternoon --

MR. METCALF:  Mr. Quaglin.

THE COURT: All right. I don't have you for -- are you standing in for someone, Mr. Metcalf?

MR. METCALF: I'm standing in for Joseph McBride.

THE COURT: Okay. Okay. Thank you, Mr. Metcalf.

MR. METCALF: Thank you.

THE COURT: Good afternoon, gentlemen.

MR. OHM: Eugene Ohm, standing in for Sabrina Shroff, for David Mehaffie. Good afternoon, Your Honor.

THE COURT: Good afternoon, Mr. Ohm, and good afternoon, Mr. Mehaffie.

MS. DOUENAT: Good afternoon, Your Honor. Marina Douenat on behalf of Mr. Steven Cappuccio.

THE COURT: Good afternoon, Ms. -- Douenat?

MS. DOUENAT: Douenat. Just like the name Duane and then ah.

THE COURT: Douenat. Thank you.

MS. DOUENAT: Thank you.

THE COURT: Good afternoon, Ms. Douenat, and good afternoon, Mr. Cappuccio.

MR. WOODWARD: Good afternoon, Your Honor. Stanley Woodward on behalf of Federico Klein, who is present.

THE COURT: Good afternoon, Mr. Woodward, and good afternoon, Mr. Klein.

All right. Well, that took a while.

We order the government to follow its *Brady* obligations

as we have some new defendants.  Pursuant to the Due Process Protections Act, the Court orders that all government counsel should review their disclosure obligations under *Brady v. Maryland* and its progeny as set forth in Local Criminal Rule 5.1 and comply with those provisions.

The failure to comply could result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, continuances, bar discipline, or any other remedy that is just under the circumstances.  I'll also be entering a minute order to that effect.

All right.  Ms. Jackson, are you speaking for the government?

MS. JACKSON:  Yes, Your Honor.

THE COURT:  All right.  You've got us all here.  What do you want to do?

MS. JACKSON:  Thank you, Your Honor.  From the government's perspective, there are approximately eight issues to deal with.

The first being arraignment for -- all the defendants except for Mr. Mehaffie have to be arraigned on the new superseding indictment.

THE COURT:  Okay.  Keep going.

MS. JACKSON:  The second issue that we're aware of is the -- initial conditions must be set for Mr. Klein in this

case.  They were set in his original case.

The third issue that we need to deal with is the request for changes in conditions of release that were put forth by various counsel and put forth by pretrial as well.

The fourth is the protective order, outstanding motion that we filed to put a protective order in place, specifically as it relates to materials provided to Defendants Mehaffie, Klein, and Cappuccio.

The fifth -- although I don't know if we're addressing it now or not -- is the motion by Mr. --

THE COURT:  Judd.

MS. JACKSON:  I don't know how to pronounce his name -- Kiyonaga to represent Mr. Morss as well as Mr. Sills.  The second -- there's not much to do here.  There's a pending motion regarding compelling discovery as it relates to the potential issue of -- or an allegation of selective prosecution.  The government intends to reply -- file a reply to that motion within two weeks.  I don't know if Your Honor wanted to address it further at this point.

The seventh, we were going to provide a general update on the status of discovery overall in this particular case and the -- the January 6th case overall.

And then the eighth is what we're doing from here and whether or not we're setting a status date or a trial date.

THE COURT:  All right.  Why don't we handle those

last couple.  Why don't you tell me where those things are as far as you're concerned and what your --

MS. JACKSON:  Starting with the discovery issues and -- discovery and where we're at, once the protective order is in place, we will have provided thousands of files for all of the defendants, all these nine defendants, to each other and to their respective counsel, basically compromising -- comprising the bulk of all the individualized discovery as it relates to these defendants at this time.

We're still working one on one with some defense counsel to provide things like copies of phones, which require hard drives and things like that.

As it relates to the broader January 6th cases, the government has filed a repeated series of updates on the status of the discovery outlining how the government has at this point -- is funding and developing two separate databases for the defense to access a variety of materials; first a Relativity platform that we're funding and developing for all the case files, for the other January 6th defendants, tips, and other files we've incorporated into it.

And then the second is an evidence.com database which is focused specifically on USCP footage, body-worn camera footage, and other video footages -- video footage that the government has acquired in this very, very large investigation.

We've provided more specific updates, but essentially

the evidence.com update, which is the videos, is now active, is my understanding, with FPD who is then going to manage handing out the -- I'm not going to use the right word -- user licenses or usernames to all of defense counsel.  That was -- we updated the status of that in the most recent discovery production to defense.

My understanding is it now contains many, many, many, many USCP videos, and the body-worn cameras being updated to that as well.  In the meantime, we've separately provided over 250 body-worn camera videos that we know are potentially relevant to these particular defense counsel over the past few months.

So that's where we're at in terms of the status of the discovery.  Generally, there's also been multiple rolling large productions that we have made both in this case and other January 6th cases of files that defense might view as pertinent to the case, such as IAD -- or internal investigations into USCP officers and the files associated with that; similarly, internal investigation and the weighted use of force investigations and documentation as it relates to MPD officers.  Those have already been provided.

And we continue to make -- my understanding is that the broader discovery team for the January 6th cases has additional plans for large-scale document productions that are relevant to everybody -- or potentially relevant to everybody, along the

same line as we wait for the Relativity platform to be in place.

In other words, while we're -- we have a plan to get it all, in the meantime, we're still trying to get more pieces out, as we can.  But that is my general understanding of where we're at in terms of the discovery in this particular case.

THE COURT:  So it doesn't sound like you've got any end date or horizon at this point?

MS. JACKSON:  I personally don't have any more information than what was provided in the most recent updates; namely, that we're trying to get them online in the next couple weeks for both -- both two different databases and then our filling them up with all the data we can, which, as more defendants come, there's going to be more.  But there's been a huge and monumental effort, both in terms of hiring and spending, to try to get this done and try to get the files into those systems as soon as possible.

THE COURT:  Okay.  What are you proposing for next steps, ma'am?

MS. JACKSON:  We have offered plea offers out to everyone some months ago, some recently.  I don't know if anybody at this point has -- wants to actually reject that offer on the record or if they're still considering it.  Given that they're still -- we don't know who's going to trial and who's not and then the amount of discovery that is still

ongoing, we are asking to set another status 45 days to 60 days out so that we have a more concrete view of the realistic timeline in which defense counsel will have the discovery it needs to prepare for trial, and we know and understand who's actually going to go to trial so that we can book an appropriate amount of time and the appropriate courtroom size.

THE COURT:  Right.  Yeah.  We need to -- this is not going to work long-term.

MS. JACKSON:  Right.

THE COURT:  So we need to figure out either is there going to be a severance or are people pleading out?

MS. JACKSON:  Right.  And I just don't think that we're at the point where we can make any of those calls right now, especially with nobody on the record yet rejecting the plea offers that are currently outstanding in this --

THE COURT:  Do your plea offers have deadlines?

MS. JACKSON:  We had not set a hard deadline because we just did supersede, and out of fairness to them.  Plus, unfortunately with the delay of the protective order getting out, the three newest counsel don't have access to the same stuff that the other folks do.  So they need time to actually look at that.  We would like -- our goal, ideally?  Although we're trying not to be unflexible in this, but our goal is to have that deadline be the next status hearing.  That's why we want it set out far enough in advance people can make a

realistic decision and put it on the record at that point.

THE COURT:  Okay.  So I'll tell you what I'm inclined to do; come back in 60 days, as -- as you're suggesting, and allow any defendants who wish to waive their presence to do so, assuming they don't have -- there are no probation flags that have been raised in the meantime.  And I hope 60 days from now you're going to be able to give me a better sense of where this is going; and really going to be looking to the government to help kind of organize people in terms of future dates and if we're going to be splitting this or -- or what have you.

MS. JACKSON:  Understood, Your Honor.

THE COURT:  Does that all make sense to you?

MS. JACKSON:  Yes, it does.

THE COURT:  Okay.  I'll hear you as to Mr. McCaughey's motion to modify conditions of release.

MS. JACKSON:  As it relates to -- frankly, Your Honor, this analysis is very similar both for Mr. McCaughey, Mr. Stevens, and Mr. Judd.  We -- well, let me take that back.

The analysis is very similar for Mr. McCaughey and Mr. Judd at this point in time.  Mr. McCaughey and Mr. Judd both have home confinement at the moment.  We would be amenable to a step down, to just GPS, but are asking that the Court maintain at least GPS for these two and for Mr. Stevens at this point.

The main -- I understand that they've all been compliant. We have not had a single issue with them, but we do view GPS as valuable in both ensuring that they're complying with the stay-away that exists in this case from D.C., other than for court appearances or meeting with their counsel, but also as a deterrent to prevent them or convince them not to engage in another violent demonstration like this because they'd know they would be on GPS and, therefore, would -- the government would know if they were there. We think it does provide a good measure of deterrence and it is working.

And it -- it is not such an inconvenience that it actually impedes them from living their life, from going to work, from meeting with people that they need to meet with, going to religious meetings. It's effective and it's reasonable, and given the very -- very serious charges that they're all facing and the -- the alleged acts that they -- we have alleged that they've committed, we do think that that is appropriate in this particular case.

For Mr. Stevens, he was originally set on just GPS monitoring, not home confinement. But for the same reasons, we do believe that he should maintain and stay on GPS as a requirement for his conditions of release.

THE COURT: So you're -- I think I hear your main concern being they're going to engage in another protest?

MS. JACKSON: Not protest.

THE COURT:  Riot?

MS. JACKSON:  Violence.  Violent demonstration.  I don't know whether it's -- it could be in the form of a protest or going to a state capitol or state courthouse and taking it a step beyond what is legal and peaceful.

THE COURT:  Okay.  So your recommendation is they're free to go where they want, other than the current stay-away, but just leave them on GPS?

MS. JACKSON:  Yes, Your Honor.

THE COURT:  So that's for McCaughey, Mr. Judd, and Mr. Stevens?

MS. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  For Mr. Klein, I take it you're comfortable with the conditions of release in his prior case?

MS. JACKSON:  Can I call for -- if you don't mind, bring in my co-counsel?

THE COURT:  Phone a friend?

MS. JACKSON:  Yes.

MS. BOND:  Thank you, Your Honor.

With respect to Mr. Klein, the government is actually supporting pretrial's request to remove him from supervision and have him stepped back.  This is the fourth pretrial report that they have filed where they're asking for some sort of sanction because Mr. Klein has repeatedly been unwilling to work with pretrial to abide by conditions.  So we are

requesting -- we fully support pretrial's request here.  And I can go into more detail if Your Honor would like.

One issue with respect to Mr. Klein is Judge Bates did set the conditions of release in the 236 case, and we've all been operating under the assumption that those conditions continue to carry through, but I'm informed by pretrial that they're not actually able to file any reports in 21-cr-40.  So we're asking Your Honor to set -- set conditions and address the issues in this particular case so that the conditions are -- from the prior case carry over and then we address the pretrial violations that have been filed in the 236 case.

THE COURT:  Does Mr. Klein have any priors?

MS. BOND:  Your Honor, no, he does not.

THE COURT:  Okay.

MS. BOND:  He was originally detained by the magistrate judge, and then Judge Bates reviewed that and released him in April.  He was on home detention.  And after the first two violations -- the first two, pretrial requested that he be placed on home incarceration, which is a higher level of home confinement.  But now they are requesting complete removal.

THE COURT:  So why wouldn't home detention work here?

MS. BOND:  I'm sorry?

THE COURT:  Why don't you think home detention is appropriate?

MS. BOND:  We're actually asking for --

THE COURT:  I know you're asking for him to be stepped back.  I'm asking why -- I mean, it seems like he likes to go to the beach.

MS. BOND:  So we don't think home detention is appropriate, and we don't think home incarceration is appropriate anymore.  If Your Honor is not inclined to remove him and have him stepped back, then we do think that the increased home incarceration as opposed to home confinement is appropriate.

He does seem to like to blow off pretrial.  He likes to stop at Chipotle on the way to his drug analysis.  He likes to go to his mother's house and get drunk there, such that he can't come home in time.  He likes to not report to pretrial when he's supposed to be reporting to pretrial.

All of those are indicative of what we argued to Judge Bates months ago; that he is unwilling to comply with conditions of release.  And I think the last six months have really borne that out; that he blows them off.  He doesn't take it seriously.  He doesn't think that it applies to him; that somehow he is above this process.  And that's the pattern that we have seen.

THE COURT:  Remind me, what's the difference between home incarceration and home detention?

MS. BOND:  Your Honor, pretrial described it as -- so

his home detention, he is restricted to his residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities approved in advance by pretrial.  So it's pretty open.  He's allowed to do a lot of things.

Home incarceration, which would be the next step, he's restricted to a 24-hour-a-day lockdown at his residence, except for medical necessities and court appearances or other activities specifically approved by the Court.

THE COURT:  Okay.  Thank you, ma'am.

Do you have a position on Mr. Morss's motion to substitute counsel or does --

MS. BOND:  I will ask Ms. Jackson to speak to that.

THE COURT:  Okay.

MS. JACKSON:  Before I do, Your Honor, the --
Ms. Bond is actually best able to also speak to
Mr. Mehaffie's -- pretrial's concerns regarding Mr. Mehaffie before we switch.

THE COURT:  Okay.  Okay.

MS. JACKSON:  We wanted to deal with that issue first.

THE COURT:  Sure.  That's fine.  Oh.  Maybe
Mr. Mehaffie is the one who's going in the water.  I think I'm getting my --

MS. BOND:  So with respect to Mr. Mehaffie, we have a different view than we have with respect to Mr. Klein.  We are not asking that he be removed from supervision.  We defer to pretrial, if they have some sort of lesser sanction that they recommend imposing.

Mr. Mehaffie does not have a criminal history, and this is his first violation of pretrial.  We ask that he be admonished and the Court consider a sanction, but we don't think that removal is appropriate at this time.

THE COURT:  Okay.  All right.  Give me just a moment.

THE COURT REPORTER:  Where is that beeping coming from?

THE COURT:  Does somebody have a phone on?

THE PRETRIAL SERVICES OFFICER:  Your Honor, it's a GPS ankle monitor beeping.

THE COURT:  Okay.  Got it.  Can't do much about that.

All right.  Yes, ma'am.  You were going to talk about Mr. Morss.

MS. BOND:  Ms. Jackson is going to talk about Mr. Morss.

THE COURT:  Okay.

MS. JACKSON:  So as it also relates to Mr. Morss, I -- when Mr. Kiyonaga called to let us know that he was hired by Mr. Morss, I raised the one concern the government has; mainly, a potential conflict between Morss -- his

representation of Mr. Morss and Mr. Sills.

The most obvious conflict that comes to mind is in his position as defense counsel for either party, he -- the government thinks it's inevitable that he's going to have to compare and contrast both the evidence available for each and the culpability of each in terms of arguments both to the jury or arguments and sentencing before Your Honor.

And that raises some concern.  I don't -- it just raises some concern because that does seem to be an obvious conflict in this particular case.  It would be different if they weren't joined in one group, but because they are, we are -- we do have some concerns about that.  At the time he said he was going to think about it, but he thought it was waivable.  And I just wanted to make sure that it was addressed before Your Honor and then would leave it up to Your Honor in terms of next steps regarding what would occur.

THE COURT:  Okay.  Thank you.

All right.  Ms. Chaclan, can we go ahead and arraign the defendants.

THE COURTROOM DEPUTY:  Mr. McCaughey, if you could come forward with your attorney.  This will be addressed to you, but, Mr. Urso, you can answer for him.

Patrick Edward McCaughey, III, in Criminal Case 21-40 in which you are charged by an indictment on Count 14, assaulting, resisting, or impeding certain officers and aiding and

abetting; Counts 24 and 25, assaulting, resisting, or impeding officers using a dangerous weapon; Count 34, obstruction of an official proceeding and aiding and abetting; Count 35, civil disorder; Count 37, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 45, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol grounds or buildings, do you waive the formal reading of the superseding indictment, and how do you wish to plead?

DEFENDANT MCCAUGHEY:  I agree to waive the formal reading, and I enter a plea of not guilty.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Mr. Stevens, along with your attorney.

THE COURT:  All right.  I think we can have the attorneys respond on the defendants' behalf.

THE COURTROOM DEPUTY:  Tristan Chandler Stevens, in Criminal Case 21-40 in which you're charged by an indictment on Counts 14, 16, and 33, assaulting, resisting, or impeding certain officers and aiding and abetting; Count 21, assaulting, resisting, or impeding certain officers using a dangerous weapon; Count 34, obstruction of an official proceeding and aiding and abetting; Count 35, civil disorder; Count 36, disorderly and disruptive conduct in a restricted building or

grounds with a deadly or dangerous weapon; Count 44, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol grounds or buildings, do you waive the formal reading of the superseding indictment, and how do you wish to plead?

MS. COBB:  He'll waive the formal reading and plead not guilty on all counts.

THE COURTROOM DEPUTY:  Thank you.

Mr. Judd, with your attorney, please.

David Lee Judd, in Criminal Case 21-40 in which you're charged by an indictment on Counts 16 and 33, assaulting, resisting, or impeding certain officers and aiding and abetting; Count 22, assaulting, resisting, or impeding certain officers using a dangerous weapon; Count 34, obstruction of an official proceeding and aiding and abetting; Count 35, civil disorder; Count 38, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 46, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol building or grounds, do you waive the formal reading of the superseding indictment, and how do you wish to plead?

MS. MULLIN:  On behalf of Mr. Judd, Mr. Judd waives a

further formal reading and enters a plea of not guilty.

THE COURTROOM DEPUTY:  Thank you.

Mr. Christopher Quaglin.

Christopher Joseph Quaglin, in Criminal Case 21-40 in which you're charged by an indictment on Counts 1 and 3, assaulting, resisting, or impeding certain officers; Count 2, inflicting bodily injury or certain officers -- on certain officers; Counts 4 and 20, robbery and aiding and abetting; Count 11, assaulting, resisting, or impeding certain officers and aiding and abetting; Counts 23 and 26, assaulting, resisting, or impeding certain officers using a dangerous weapon; Count 34, obstruction of an initial proceeding and aiding and abetting; Count 35, civil disorder; Count 39, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 47, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol grounds or building, do you waive the formal reading of the superseding indictment, and how do you wish to plead?

MR. METCALF:  We waive a formal reading and enter a plea of not guilty on all counts.

THE COURTROOM DEPUTY:  Thank you.

MR. METCALF:  Thank you.

THE COURTROOM DEPUTY:  Mr. Robert Morss.

Robert Morss, Criminal Case 21-40 in which you're charged by an indictment on Counts 5 and 20, robbery; Count 6, robbery and aiding and abetting; Counts 10 and 27, assaulting, resisting, or impeding certain officers and aiding and abetting; Count 34, obstruction of an official proceeding and aiding and abetting; Count 35, civil disorder; Count 41, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 49, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol grounds or buildings, do you waive a formal reading of the superseding indictment, and how do you wish to plead?

MS. TOPLIN:  On behalf of Mr. Morss, we do waive formal reading and ask that the plea of not guilty be entered.

THE COURTROOM DEPUTY:  Thank you.

Mr. Geoffrey Sills.

Geoffrey William Sills, in Criminal Case 21-40 in which you're charged by an indictment on Counts 7, 8, 15, and 18, assaulting, resisting, or impeding certain officers using a dangerous weapon; Count 13, robbery and aiding and abetting; Count 34, obstruction of an official proceeding and aiding and abetting; Count 35, civil disorder; Count 40, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 48, engaging in physical

violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol grounds or buildings, do you waive the formal reading of the superseding indictment, and how do you wish to plead?

MR. METCALF:  We waive formal reading and enter a plea of not guilty.

THE COURTROOM DEPUTY:  Thank you.

Mr. Steven Cappuccio.

Steven Cappuccio, in Criminal Case 21-40 in which you're charged by an indictment on Count 28, assaulting, resisting, or impeding certain officers and aiding and abetting; Count 29, assaulting, resisting, or impeding certain officers using a dangerous weapon; Count 30, robbery and aiding and abetting; Count 34, obstruction of an official proceeding and aiding and abetting; Count 35, civil disorder; Count 42, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 50, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building; Count 53, act of physical violence in a Capitol grounds or buildings, do you waive the formal reading of the superseding indictment, and how do you wish to plead.

MS. DOUENAT:  Yes.  On behalf of Mr. Steven Cappuccio, he waives the formal reading of the indictment and

he pleads not guilty to all counts.

THE COURTROOM DEPUTY:  Thank you.

And Mr. Klein.

Federico Guillermo Klein, in Criminal Case 21-40 in which you're charged by an indictment on Counts 9, 17, 19, and 27, assaulting, resisting, or impeding certain officers and aiding and abetting; Counts 31 and 32, assaulting and resisting or impeding certain officers using a dangerous weapon; Count 34, obstruction of an official proceeding, aiding and abetting; Count 35, civil disorder; Count 43, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon; Count 51, engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon; Count 52, disorderly conduct in a Capitol Building, and Count 53, act of physical violence in a Capitol grounds or buildings, do you waive the formal reading of the superseding indictment, and how do you wish to plead?

DEFENDANT KLEIN:  I wish to waive all formal -- all formal reading and enter a plea of not guilty.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  Thanks, folks.  You may be seated.

All right.  Mr. Urso, I'll hear from you.  I want to discuss 60 days.

I imagine the government is seeking to toll the time in

the next 60 days?

MS. JACKSON:  Yes.

THE COURT:  All right.  Let me know what you think about that.

MR. URSO:  Sixty days works, Your Honor.  I think that makes sense.  We agree to tolling.  No problem with that.

THE COURT:  What do you think about the GPS monitoring?

MR. URSO:  Your Honor, just for the record, I indicated to the government on the way out, Mr. McCaughey actually started on home confinement and has since been -- he was already previously dropped down to GPS.  So he's been on GPS now a couple months.  He's been supervised -- I think it was by agreement last time.  They knocked it down from home confinement to GPS.  So he's been on GPS alone since, I think, the last status or maybe before that.  So right now, he's just got the GPS.

And this -- this motion, Your Honor, frankly, was brought at the behest of his senior pretrial services officer who's supervising him.  He asked me to suggest that I file a motion.  In fact, he reached out this morning to Mr. McCaughey to confirm that this is on the calendar.  This is really -- he's pushing this.  Obviously we're -- we're asking for it as well.

I understand the government's blanket position on, sort

of, GPS, but it's not without its limitations or problems for the defendant.  For instance, he can't wear his work boots.  He can't work on his unfinished basement in his house because it goes out of range.  The unit is in the main level.  He has to be home if he's working late.  He's got to get home to charge it within 12 hours.  So it's not without important inconveniences.

THE COURT:  How is your client employed, sir?

MR. URSO:  He works full-time for his father's construction company, Your Honor, McCaughey Construction.  And as -- as I indicated in my motion and in the pretrial services email, he's been a model -- model client from day one.  I mean, he's just been a perfect client.

And, again, this is really being pushed by his supervising officer, and -- and he is a senior pretrial services officer up in Connecticut.  So I assume he's dealt with, you know, hundreds or thousands of clients like this.  And, you know, I see that the government has deferred to pretrial services on other matters in the opposite direction; at least one I heard this morning.

I just think that's why we have these pretrial services officers because they're the ones hands-on, they know what the client requires regarding supervision.  And obviously before January 6th he had a spotless record.  Your Honor may or may not recall, he had a lot of letters, and he's been spotless

since.  And it's -- it's just -- honestly, just not necessary.  And I agree with the pretrial services officer, and I'd ask the Court to -- to modify it.

THE COURT:  Okay.  Do we have someone here from pretrial services?

THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

THE COURT:  Great.  Thank you.

Mr. Urso, anything else you wanted to discuss?

MR. URSO:  No, Your Honor.  In -- in terms of the -- the delay, I mean, I can tell the Court just -- it takes me upwards of a day just to download some of these discovery batches we get.  So I'm completely in agreement with pushing this back.

THE COURT:  Okay.  Thank you.

THE PRETRIAL SERVICES OFFICER:  Your Honor, Shay Holman, pretrial services.

First, let me address the issue.  Pretrial has had issues with other jurisdictions.  Pretrial absorbed the first 400 cases from the riot cases, and then in April we started asking for courtesy supervision.  So we've had an issue with other jurisdictions speaking to attorneys and not keeping us in the loop.  And that's what happened in this case.

I will say that the supervising officer in the jurisdiction emailed me about two weeks ago.  And when I asked for compliance, he was compliant, and that he recommended

stepping down -- removing location monitoring.  I told him at that time pretrial does not make that recommendation.  If the attorney files a motion, then we will give our opinion, and I left it at that.  I did not know until defense counsel just made representations that the officer contacted him.  So that is the issue that I will address with him.

That being said, he has remained compliant, and I did confirm earlier this afternoon that he is on GPS.  So he was stepped down from home confinement to GPS.

So I just want to make the record clear that when defense counsel is stating pretrial, he's speaking in reference to the other jurisdiction, and we've tried to explain to them that D.C. pretrial is the one that has to come before the Court and make -- and make the recommendation.

So with that being said, he has been compliant.  So we will defer to the Court.

THE COURT:  Any thoughts on the -- concern about the boots, whether -- have you heard about that before?

THE PRETRIAL SERVICES OFFICER:  That's an ongoing issue that we have with defendants in general, Your Honor.  If they wear the work boots that come up a little higher, the GPS devices can be a little bulky and they're hard to -- for them to securely close their work boots all the way.  They have to, kind of, leave them untied so -- because the GPS can be about this thick, and it doesn't fit comfortably.  So that's the

issue we've had for years.

THE COURT:  Okay.  I'm granting Mr. McCaughey's motion.  Do you need me to sign anything, ma'am?  All other conditions will remain in place.

THE PRETRIAL SERVICES OFFICER:  Just the minute order, Your Honor, that you're -- so you're taking him off of location monitoring?

THE COURT:  Correct.

THE PRETRIAL SERVICES OFFICER:  Okay.

THE COURT:  Okay thank you, yes, ma'am.

Ms. Cobb, same questions.

MS. COBB:  Okay.  As to the 60 days, we also do not object.  We're --

THE COURT:  Do you agree -- you agreed to waive tolling -- or to toll?

MS. COBB:  Yes, we agree to the tolling.

THE COURT:  So, Mr. Urso, you agree as well?

MR. URSO:  Yes, I agree.

THE COURT:  Okay.  Thank you.

MS. COBB:  So that's not an issue for us.  We're having the same issues with just it takes time to download, not to mention watch all of the discovery we've been provided.

As for our motion to modify Mr. Stevens' conditions, it's based on time, for the most part.  Mr. Stevens has been on pretrial release longer than any of the other defendants in

this case.  He was released on February 10th.  So next week it'll be eight months that he has been on a GPS monitor.  He has during that eight months showed that he does respect the conditions, respects the Court.  He has not had one issue.

I check in with his pretrial services officer in the Northern District of Florida on a regular basis, and nothing has ever come up.  He is every -- you know, every condition, everything he's asked to do, he's doing it.  And so our request, Your Honor, is just that -- certainly we understand when he was initially put on pretrial supervision, the Court didn't know how it would go, didn't know if they could trust Mr. Stevens.

But here we are.  We have eight months of him completely complying and showing that he does respect the Court and that he will follow the conditions.  And so it's our position at this point eight months in for him that GPS is greater than necessary to -- to ensure the safety of the community, to ensure that he'll come to court.  So that's why we're asking you to remove it.

THE COURT:  All right.  Anything else for Mr. Stevens, ma'am?

MS. COBB:  No, Your Honor.  I think that's it.

THE COURT:  Mr. Stevens' motion is denied.

Mr. Massey.

I should say, ma'am, that's without prejudice to you

re-raising it later, but at this point I think it's appropriate.

Mr. Massey.

MR. MASSEY:  Good morning, Your Honor.

THE COURT:  Good afternoon.

MR. MASSEY:  Good afternoon.  True.

I guess we have John's motion -- Mr. Kiyonaga's motion to substitute.

THE COURT:  Yeah, I'm not sure that I can handle that right now.  I'm kind of concerned he's not here.  How do you --

MR. MASSEY:  I -- I understand he's returning to the -- returning tonight.  So if the Court would like, I'm sure he can do a remote conference or remote session this week, whatever -- whatever is best for the Court.  Today was just the odd bad day out.

THE COURT:  Yeah.  Have you-all talked about how we should assure ourselves that both defendants are going to be adequately --

MR. MASSEY:  Yeah.  I think Mr. Kiyonaga's view is that this is a unique indictment, which I think the Court recognized just by scale, and Mr. Sills and Mr. Morss are not -- their interests aren't adverse, and it's hard to see how they would ever end up adverse.

THE COURT:  Well, I can certainly imagine -- I mean, sentencing, if nothing else.  Might not come to sentencing, but

I'm sure every defense counsel is going to want to be able to argue that his client is the least worst and don't -- don't compare them to our -- contrast them to all these other baddies out there.

MR. MASSEY:  Perhaps.  But Mr. Morss and Mr. Sills, they don't know each other.  The indictment doesn't allege either collaboration or conspiracy.  The indictment doesn't even allege, like, a common collaborator in that Mr. Sills didn't collaborate allegedly with -- with individual X who also collaborated with individual -- with -- sorry -- with Mr. Morss.

So I think it's just by virtue of this unique circumstance that joined them in the matter that they wouldn't otherwise be joined in, and I think that's Mr. Kiyonaga's view. And Mr. Kiyonaga spoke with both -- both defendants and explained the issue, explained their ability to have an attorney who doesn't represent another co-defendant and explained that based on the circumstances of this case, there could conceivably be an instance where -- I don't even want to say that because I'm not entirely sure how --

THE COURT:  All right.  Let's -- why don't we do that in another hearing.

MR. MASSEY:  Sure.

THE COURT:  Mr. Kiyonaga and, I guess -- remind me, are you his current counsel of record?  Or who is the current

counsel of record?

MR. MASSEY:  Mr. Kiyonaga is current counsel for Mr. Sills.

THE COURT:  Okay.  So counsel of record for Mr. Morss?

MR. MASSEY:  Ms. Toplin.

THE COURT:  Ah.  Thank you.  And so Mr. Kiyonaga is -- Mr. Morss is looking to hire Mr. Kiyonaga.  Is that correct, ma'am?

MS. TOPLIN:  That is correct.  I discussed it at great length with Mr. Kiyonaga.

THE COURT:  Okay.  So I think when we get to Mr. Morss, we should set another hearing for that purpose.  I don't know that Mr. Kiyonaga is -- do you think Mr. Quaglin [sic] should appear as well?

MR. MASSEY:  No.  I'm not sure why.  I don't believe so, no.

THE COURT:  Okay.  Anything else that you want to address, sir?

MR. MASSEY:  No.  I believe that's it, Your Honor.

THE COURT:  Okay.  And on behalf of Mr. Quaglin, are you comfortable -- you are representing Mr. Quaglin?

MR. MASSEY:  Mr. Sills.

THE COURT:  I'm sorry.  Mr. Sills.

MR. MASSEY:  I'm standing in for John, Mr. Kiyonaga.

No, Mr. Sills is detained. So we -- we do not think a 60-day tolling period is appropriate. I understand the government's issues, but 60 days is a long time for a detained defendant.

THE COURT: Okay. Anything else --

MR. MASSEY: No, Your Honor.

THE COURT: -- you wanted to raise on behalf of Mr. Sills?

MR. MASSEY: No, Your Honor.

THE COURT: Okay. Thank you.

Mr. Metcalf, you're representing Mr. Quaglin -- sorry about that. You're standing in for Mr. McBride?

MR. METCALF: That's correct.

THE COURT: Okay. What does Mr. Quaglin say to a 60-day continuance, speedy trial tolling?

MR. METCALF: We have no objections, and we'll agree to tolling for the 60 days, especially in light of how long it takes for the discovery material to get to Mr. Quaglin and his recent transfer to the D.C. jail and the wait list that goes along with him receiving the discovery. So we have no objection to tolling 60 days, Your Honor.

THE COURT: Okay. Anything else you wish to address on behalf of Mr. Quaglin.

MR. METCALF: Just one issue, Your Honor -- and it's more for the record and for Your Honor's attention -- is that

Mr. Quaglin's medical attention has become a serious concern of Attorney McBride.  He has an autoimmune disease where he has to abide by a very strict diet.  Those diet limitations and -- have not been abided by since he's been basically in D.C. jail.

So for the last 14 days he's been quarantined and is not being given the food that can comply with such dietary restrictions, and it has left him in a substantial state, a weakened state.  And in doing that, he's had to file numerous grievances, to the tune of, I believe, 14 in the last two weeks.  And, more recently, his pens were actually taken way so he does not have the ability now so he can fill out these grievances.

I asked the marshals today if I could give -- give a handful of ballpoint pens for Mr. Quaglin to be able to use.  That request was obviously denied, but this is just something we'd like to bring to the Court's attention and Attorney McBride will feel, if necessary, to bring this forward on a bail modification application, if he so chooses to do so.

THE COURT:  Have you-all talked with the marshals service about that?

MR. METCALF:  As far as his dietary --

THE COURT:  The medical.

MR. METCALF:  -- restrictions?  I believe Attorney McBride has.  I have not been privy to those conversations.

THE COURT:  Okay.  If he hasn't, why don't you encourage him to reach out to the marshals service.  They might be able to help.

MR. METCALF:  Absolutely.

THE COURT:  Thank you, Mr. Metcalf.

Ms. Mullin, I believe I skipped over you.  I'm sorry about that.

MS. MULLIN:  Good afternoon.  On behalf of David Judd, with respect to the 60 days, we have no objection to a continuance and waiving speedy trial, tolling the speedy trial.  He would like to waive his presence at the next status hearing.  He's qualified for court-appointed counsel, and the ticket to get out here was quite expensive.

So if the Court would either -- I can file a written waiver or if the Court would colloquy him today, he'd like to waive his presence at the next status hearing.

Other than that, we have no objection.

THE COURT:  That's -- I'm fine with that, assuming that there are no pretrial supervision issues that have been raised by probation in the meantime.

MS. MULLIN:  Okay.  Would the Court like a written waiver prior to the hearing?

THE COURT:  Yes, please.

MS. MULLIN:  Thank you.

With respect to our motion to modify conditions of

release, Your Honor, Mr. Judd has been on home detention and GPS since May.  He has no prior convictions.  He's been in complete compliance.

And I hope we don't run into the same communication issue, but I also spoke with his pretrial officer, Fred Forman, and provided Mr. Forman's number to government counsel and to chambers.  And I don't know if he talked to pretrial services here in D.C.  I hope that we don't have that issue here.  But Mr. Forman did represent that he does not think that Mr. Judd needs to be on GPS monitoring anymore or home detention anymore, and he -- he is -- he did request through me that it be removed.  I don't know if the government or chambers had an opportunity to speak with him as well, but he's amenable to speaking to both government counsel and -- and chambers.

With respect to the government's argument that GPS would somehow deter him if he wanted to go to another protest or something like that, the government has already acknowledged he should be free to go where he wants.  I don't think the addition of GPS monitoring would deter him from engaging in violence.  I think the deterrent is the fear of rearrest.  Also, he has no history of violence.

In this case, he is not accused of or alleged to have injured anybody.  He's alleged to have tossed a small -- what appears to be a small sparkler, but that did not detonate.  It did not injure anyone.  He's not accused of striking anyone.

He's not accused of being any part of any fringe violent organization. He's not accused of expressing any violent messages on social media. So he really has a spotless record but for this one alleged incident at the January 6th protest.

He is employed at two jobs. He's working at a retail store, and he also works for the Dallas Cowboys in the stadium. Attends church. That was one issue we had prior because his church fell outside the jurisdiction, so Court allowed his jurisdiction to be expanded. And so there's really no concern here that -- there's really no need for GPS monitoring anymore, and his pretrial officer concurs with that assessment.

THE COURT: Is there -- is there a specific hindrance that is --

MS. MULLIN: Yes, Your Honor. There are three areas in his home and outside of his home where the GPS doesn't work. And so he's not able to help do some yardwork because there are areas of his yard where the GPS goes out. And they're rebuilding -- he lives which his mother and grandmother and they're rebuilding parts of the home, and so he's not able to assist with some of that work because the GPS doesn't work in those zones, so to speak. And so that's, you know, created a problem for him.

And same with the other defendant, you know, he works two jobs, and he does have to rush home if the GPS is going to be -- to charge his GPS. So sometimes it creates an impediment

there, but -- but those are the main issues; but, mostly, Your Honor, it's just that the pretrial officer doesn't think it's necessary anymore.

THE COURT:  Okay.  Thank you, ma'am.

Are you going to -- so I'm going to give the government two weeks to respond to your motion.  I'll ask the government to respond to your motion to compel by October 18.  If you're going to file a reply, I'll ask you to do that by October 25th.

I'll say -- I mean, it -- it strikes me that a selective prosecution argument is certainly plausible here.  Obviously that's a very high standard, and I'm a little skeptical about trolling through U.S. attorney emails in other jurisdictions. So I haven't focused on your motion, but I'd be very interested if you have prior examples of where -- what you're asking here has been allowed.  So you might focus in on that in your reply, if you haven't already done so.

All right.  Thank you, ma'am.

Can I have pretrial speak to the GPS issue.

THE PRETRIAL SERVICES OFFICER:  Your Honor, with reference to Mr. Judd, the report does indicate that he has been compliant.

I will address the issue defense counsel raised with reference to the GPS not working in certain areas.  So he is on home confinement.  So that is considered the four walls of your home.  So that's why it's set up for that.  So going out into

the yard or taking the trash out, all of that is not -- not permitted.

But other than that, the report indicates that he has been compliant with location monitoring and other conditions of release.  So we would defer to the Court.

THE COURT:  Okay.  He's current -- I thought he was just on GPS monitoring, but he's actually on home confinement right now?

THE PRETRIAL SERVICES OFFICER:  Right.

THE COURT:  Okay.

THE PRETRIAL SERVICES OFFICER:  Based on the report I have in front of me, he's on home confinement.

THE COURT:  All right.  Ms. Mullin, that's your understanding as well?

MS. MULLIN:  Yes.  He's permitted to work.

THE COURT:  Okay.  I am granting the motion to modify insofar as he will be removed from home confinement.  He will remain on GPS monitoring.  All other conditions will remain the same.

THE PRETRIAL SERVICES OFFICER:  Your Honor, is that GPS only or GPS with a curfew?

THE COURT:  GPS only.

THE PRETRIAL SERVICES OFFICER:  GPS only.  Okay.

THE COURT:  Okay.  Thank you, ma'am.

Ms. Toplin.

MS. TOPLIN:  Your Honor, in terms of the 60-day date, I'm inclined on behalf of Mr. Morss not to object because of Mr. Morss's application for substitute counsel.  Mr. Morss, however, has been incarcerated since June.

The -- there are vast amounts of discovery that are coming in regularly.  We've heard about the two discovery platforms that are supposed to be up and running so we can access the discovery more easily; however, we don't have any time frame as to when that may occur.  So I'm wondering if the Court is going to consider a discovery deadline or a date by which at least we could have some clarity as to maybe when -- I mean, I recognize *Jencks* and things like that may come much closer to the trial date, but just in terms of the -- the vast amounts that are coming, sort of, randomly, when the Court may set a date to, kind of, have all that complete.

THE COURT:  I understand the concern.  I'm not going to do that today, but the time -- the time is probably approaching where we need to do something.

MS. TOPLIN:  Thank you.

And, Your Honor, previously I think you asked whether Mr. Quaglin should be present at the status of counsel hearing.  I think it's Mr. Sills, and -- and I do believe -- maybe it's not my place to -- to raise this, but in speaking with Mr. Kiyonaga, we kind of both discussed the propriety of actually having both defendants present at that hearing.  So I

just want to make sure that that -- I think both need to be colloquied.

THE COURT:  Okay.  So I'll suggest -- well, actually, your client is at D.C. jail; is that --

MS. TOPLIN:  My client is at D.C. jail, yes.

THE COURT:  Okay.  So, Ms. Chaclan, can you check?  I was thinking Tuesday, October 26th at 11:00 a.m. for a Zoom hearing.  Do we have to see if we can get a --

THE COURTROOM DEPUTY:  What was the date?

THE COURT:  October 26th.  Does that work for government, while we're looking, Tuesday, October 26th, 11 a.m.?

MS. JACKSON:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  Does that work for you, ma'am.

MS. TOPLIN:  Yeah, that's fine.

THE COURT:  Stick around.  This is very complicated.

Okay.  Why don't you suggest a date, Ms. Chaclan.  You've got my calendar there.  You know what -- let's do this off-line.  So I want to set a date --

MS. TOPLIN:  Okay.

THE COURT:  -- for the ascertainment of counsel.

MS. TOPLIN:  Great.

THE COURT:  And we need to have Mr. Sills and Mr. Morss and the attorneys and government.

So, Ms. Chaclan, can I just ask you to follow up on

that.  Thanks.

MS. TOPLIN:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you, ma'am.

All right.  Mr. Ohm.

MR. OHM:  Thank you, Your Honor.

On behalf of Mr. Mehaffie, we do not object to exclusion of time under the Speedy Trial Act for the next 60 days.

THE COURT:  Okay.  The government has an outstanding motion for a protective order.  Defense -- and I know this was not you -- was supposed to respond by September 21st.  I take it you have no objection to the protective order?

MR. OHM:  Your Honor, I -- I -- I guess I could just acknowledge that if there hasn't been a response filed by December -- September 21st, then there hasn't been an objection lodged yet.

THE COURT:  Okay.  I'm going to grant the government's motion for a protective order as to Defendants Mehaffie, Cappuccio, and Klein.  I understand Mr. Cappuccio has consented, and Mr. Klein consented in an earlier case.

Mr. Ohm, anything else that we should chat about as to Mr. Mehaffie?

MR. OHM:  Your Honor, I don't know if the Court needs -- we -- we joined in the government's recommendation that Mr. Mehaffie just be admonished for the violation alleged. I don't know if the Court wants to hear from me further.

THE COURT:  Okay.  So, frankly, I'm considering home detention.  I'll hear why that's not appropriate.

MR. OHM:  Sure.  Your Honor, the -- I think primarily that -- well, although this is sort of cast as tampering, there is no evidence of tampering.  In fact, when Mr. Mehaffie was directed to go to pretrial in Alabama, he did so immediately.  And when the probation office there inspected the device, they recognized that there was no evidence of tampering, and I think if you actually look at the -- Your Honor looks at the words that were used --

THE COURT:  Yeah, I agree.  I don't think -- what I understand is he went in the water when he was told not to and therefore --

MR. OHM:  Well, so what he was told was to stay away from the water.  What he understood was don't get the device wet, which I think is a very reasonable understanding of that.  And so he -- he wasn't -- he didn't understand that because obviously it wouldn't be necessarily reasonable to say that there's anything about water that would affect his pretrial detention status, whether it be listening to orders or dangerousness or risk of flight.

He understood it to mean that if you get this thing wet, then it's going to break.  So don't get wet.  And so that's -- that's what he did, and, unfortunately, what happened happened.

I want to just say for the record, Mr. Mehaffie

vehemently denies that on September 23rd that he went into the water again.  And I actually think that the information in the report corroborates that.  It says that -- it points from the shoreline leading into the water.  And I know the Court knows that GPS isn't like a -- it's not direct.  It has about a 40- to 50-foot radius.  And I think very specifically, the pretrial worker is saying -- the pretrial officer is saying that he wasn't -- it didn't show him in the water.  It showed him going towards the water.

And Mr. Mehaffie represents -- and he -- he feels very bad about the fact that the -- the -- the machine had issues, but he did not go into the water after he was told not to go into the water.

I think the rest of his compliance history shows he knows how to listen to the Court's orders.  He -- again, he went right to -- right to Alabama pretrial when he was told to.  And he hasn't had any compliance issues in the past throughout his supervision.

So those are the primary reasons, Your Honor.  I think on the other side of it, Mr. Mehaffie is -- he's a carpenter, and he also takes care of his 85-year-old mother who suffers from dementia and lives about 40 minutes away.  You know, he primarily -- his -- his -- the conditions would simply just be, I think, prohibiting him from doing that, prohibiting him from working as a carpenter, prohibiting him from going to church

and driving his grandkids around to various extracurricular activity.  That's his life.  It's not like the GPS shows that he's doing something particularly fun beyond what his obligations are.

So I think for all those reasons, Your Honor, and also because, in -- in my view, the -- the admonition from the Court would be significant to Mr. Mehaffie.  He already feels very badly about the fact that he is having to address the condition -- or an alleged violation.  But we can assure the Court that he would be more mindful, more respectful, and more liberal and also ask follow-up questions when he is in certain -- so something like this couldn't happen again.

But given the record, Your Honor, it doesn't -- it seems that he does not -- he has not actually violated any conditions.  He has not actually willfully tried to disobey anything that his pretrial officer directed him to do.  And so I'd ask the Court to leave him on his conditions of release.

THE COURT:  Thank you, Mr. Ohm.

Does pretrial services wish to be heard?

THE PRETRIAL SERVICES OFFICER:  Your Honor, first, to clarify, that there are different types of tampering.  So we look at -- when someone initially goes in for tampering, we look at if there's any screwdriver marks around the device or any marks that look like scissors were trying to cut the device off.  I just wanted to clarify.

THE COURT:  And you're not alleging that; right?

THE PRETRIAL SERVICES OFFICER:  No, we're not alleging that.  We're alleging -- we're saying that he went in the water.  I'm not sure if Your Honor received the photos that I sent --

THE COURT:  Yes.

THE PRETRIAL SERVICES OFFICER:  -- to chambers.  I don't know if Mr. Ohm received them from defense counsel.  I have them if he wants to look at them.

So it looks like, Your Honor, from the pictures on September the 20th and September 22nd is when he went into the water.  There's also an email exchange between him and the courtesy supervision officer where he admits to being on a floaty with his granddaughter, he tried to wrap it in plastic, and she advised him that she told him before the trip.

I understand if Your Honor -- pretrial's policy is when anyone tampers with the device, we ask for removal.  If Your Honor is not inclined to remove him, then Your Honor mentioned some type of home detention.  We would concur with that for a certain amount of time, if Your Honor wants to use that as a sanction.

THE COURT:  All right.  Thank you, ma'am.

Mr. Mehaffie, could you rise, please.  Sir, I'm directing you to stay away from water.  Do not -- no more floaties, no more going in the ocean.  One and only chance

here; okay?

DEFENDANT MEHAFFIE:  Yes.

THE COURT:  Don't come back with any more --

DEFENDANT MEHAFFIE:  Yes, sir.

THE COURT:  -- compliance issues.

All right.  Ms. Douenat -- Douenat.  Sorry.

MS. DOUENAT:  Good afternoon, Your Honor.

On behalf of Mr. Cappuccio, we do not object to the 60-day continuance, and we do agree that the speedy trial -- it tolls the speedy trial deadline, especially because we've only been on the case for a little over a month and two weeks.  So it's -- now that the judge has granted the protective order, we might be able to get through some of the evidence.

My only concern would be the fact that the government mentioned extending the plea deadline only for 60 days until the next status conference.  I still feel like by then, I may not have been able to get through all the evidence that a lot of the counsel has already -- other counsel on this case have already been able to go through.  So -- so I'm not sure -- I mean, I need to be able to do my due diligence before I can advise my client on what to do, and I'm hoping that by then, I would have -- would have been able to go through a lot of it, but I don't know if that's enough.

THE COURT:  Okay.

MS. DOUENAT:  That's my only concern on that.  I

wanted to state it on the record on that issue.

On another issue --

THE COURT:  Let me say for that, ma'am, obviously I'm not going to get involved in plea negotiations with the government.  It does strikes me that, you know, it's pretty common for the government to give early plea offers that would expire before the defendant would get an opportunity to see all of the discovery, sometimes even any discovery.  And your client is in the best position to know what -- what he did and didn't do and how he wants to handle it.

So I certainly understand the -- the difficulty that you face, and I'm not going to -- I'm not setting any deadlines obviously on pleas.  That's not up to me, but I think you can certainly start talking with your client about how he wants to proceed in this.

MS. DOUENAT:  And I'll discuss with -- with the government as well.

THE COURT:  Right.

MS. DOUENAT:  I mean, I know that this was just -- I mean, they just stated this, and it could just mean on behalf of other clients.  Who knows.  But I will be addressing that with the government.  I'm not trying to make the Court be involved in plea negotiations.

I do want to address one issue that was brought to my attention by my client yesterday.  He is also indigent.  He was

appointed court-appointed counsel.  So he had to fly here. He and his wife scheduled -- made flight arrangements.  And when they showed up at the airport, TSA had him on a list.  He had -- he missed his flight.  They had to reschedule him on another flight that went through -- it caused multiple problems.

The first problem they caused was that they rerouted him through -- through Chicago when his pretrial service officer knew that he was going through Dallas.  So that alerted the pretrial service officer.  They had to explain that they were detained and they both had to be searched and their baggages and luggages had to be searched.  And so it became a big ordeal for them.

And -- and my concern would be that, you know, there might be a future issue with -- with pretrial, even though I think it was addressed at the time, on -- on a potential violation, and I don't want that to be the case.  I know that they sent an email to the pretrial service officer and talked to the pretrial service officer about that change, as soon as they called them and they said you're not in Dallas like you said you would be.

My concern is I -- I'm not sure why he's on this TSA list, but it -- it did cause a huge delay, and they were at the airport far in advance of their flight; and, fortunately, they scheduled it for early Sunday so they were able to get to D.C.

in the afternoon.

THE COURT:  All right.  So are you asking me to do something, ma'am, or are you just kind of raising this?

MS. DOUENAT:  I don't know if the Court can do something, as far as TSA is concerned, and I will file a separate motion.  I just -- this was brought to my attention today, and I just wanted to alert the Court.  I did alert the government that that happened and how it was -- it was an ordeal.

THE COURT:  Yeah.  So as I said, I'm assuming your client has no infractions, I'm fine with him waiving his appearance for the subsequent status conferences.

I have heard about this in other cases, and I'll just say, I think it would be a very serious issue if the government is somehow obstructing the defendants from appearing in court.  So I've -- I haven't had any briefing on this.  I'm certainly not going to order anything, but I think if the government is going to start preventing defendants on pretrial release from coming to court, they're going to have problems.  So I'm hopeful that you will not face that in the future.

MS. DOUENAT:  Thank you, Your Honor.

And as -- as of Friday, my understanding is that he was compliant with all his pretrial service release conditions that was filed with -- with the Court on Friday from the pretrial service officer in San Antonio.

So thank you.  And, yes, we will be waiving our next status conference.

THE COURT:  Okay.

MS. DOUENAT:  Thank you.

THE COURT:  Thank you.  Mr. Woodward.

MR. WOODWARD:  Good afternoon, Your Honor.

THE COURT:  Good afternoon, sir.

MR. WOODWARD:  Assuming that Mr. Klein remains on release, we do not object to the government's request for a 60-day status hearing and waiving of the Speedy Trial Act within that period.

I'd like to address the government's characterization of the pretrial violation report that was filed.  We respectfully disagree.  Not the government, nor the Court, is privy to the communications that have been exchanged between Mr. Klein and his pretrial officer.  And as an officer of the court, I will represent that there is an obvious level of contempt demonstrated by Mr. Klein's pretrial officer in these communications.

In our view, it is not a coincidence that pretrial and the government have twice previously requested that Mr. Klein's conditions of release be modified.  Twice Judge Bates denied those requests, and now we find ourselves here in your courtroom.  Certainly the government has discretion on how it proceeds in superseding its indictments, but the timing of that

is -- is incredibly coincidental.

The, quote/unquote, violation that pretrial has most recently informed the Court of involves Mr. Klein declining to respond to questions about his release, instead asserting his Fifth Amendment rights, and what the report admits is he was doing that on the advice of counsel.

I have repeatedly reached out to the pretrial officer in this -- in this case. I don't -- she does not respond to me. This incident involving his meeting with me first required that I confirm with the pretrial officer that, in fact, I was inviting Mr. Klein to an attorney-client meeting. When we concluded that meeting, I reached out to his pretrial officer to advise that he would be late because on a good day he was 30 minutes away from home. And on that day, there was a torrential downpour and he was returning in traffic. She did not respond. She did not advise me that Mr. Klein needed to contact her. Instead, minutes after he walked in the door, she wrote him and said that my communicating with her is not sufficient.

It's -- Mr. Klein has the utmost respect for pretrial services and the conditions that the Court has placed on his release. And the so-called violations with which he has been accused of, you know, each time we have a court hearing, there's something else that they are saying he didn't do, when he is doing the best he can to comply with the allegations of

his release.

Again, I respectfully disagree with the government's characterization that he got drunk with his mother. That's not what happened, and the email correspondence that was submitted with our prior filing in this issue reveals that what happened was that he reached out to his pretrial officer, advised her that he had been drinking over lunch with his mother, and they didn't that feel it was appropriate for him to drive himself.

She granted an extension of his time out. He wasn't in violation of -- of his release. If she had said no, that's not acceptable, get in an Uber, he would have done that. Instead she said, okay, be home by what time, and he told her, and he was home by -- by a time certain.

When he was taken for a urinalysis by a friend, he didn't realize that the friend was going to make stops. His car was in the shop, which the pretrial officer was also aware of. He gets in the car with his friend who tells him that there are several stops that she needs to make. And his concern is getting to the urinalysis and back. He explained all of that to the pretrial officer and apologized profusely in correspondence that is not shared with the Court for its review.

However, we would welcome the opportunity to brief the Court on this issue, because when the Court, we submit, reviews all of the correspondence as between Mr. Klein and his pretrial

officer, you will see there's a lot more going on here as well. For example, he's been declined simple requests like going for an outdoor jog.  He's been declined requests to go to church functions, which are religious services explicitly authorized by pretrial release conditions.  And yet his pretrial officer, she will not approve these because they're, quote/unquote, social activities.

He has been declined requests to spend time with his family.  Following the incident at his mother's house, he made a request to again visit with his mother in which he arranged for transportation within time certain.  Declined because it is a, quote/unquote, social activity.

He -- he's been declined requests to go to Total Wine with no justification whatsoever.  He's been declined requests to -- he made a request, rather, to run errands in a three-hour window in which he specifically delineated the addresses where he would be stopping, and the response was:  Approved, but you may only have two hours.

So the back and forth as between his officer and -- and himself reveals that, for whatever reason, there's a -- a level of contempt harboring against Mr. Klein.  And he is doing everything he can to demonstrate his compliance with the Court's pretrial conditions and should not be punished as a result of that.  I would note that when Mr. Klein was released, as -- as the officer here today indicated, there were a number

of -- there's a backlog.  He -- after his release he spent 24 days out -- out of custody with no GPS monitoring.

What the government doesn't tell you is that they don't suggest they did anything during that period in violation of his -- of his pretrial order.  Released without GPS.  I mean, surely if there was any time within which he was going to do something, something dangerous, as the government would suggest, that -- that's when it would have happened.

And yet as I stand before you today, neither pretrial nor the government suggest that Mr. Klein presents any articulable threat to the community as -- as a whole or to a specific individually, and that is the standard that the Bail Reform Act requires this Court to consider.  So, respectfully, we don't believe that there needs to be any change.  In fact, we're inclined to file a motion with the Court asking that he be removed from GPS monitoring because it's clear that there's a breakdown in communication or -- or ability to work together as between his pretrial officer and himself.

THE COURT:  Okay.  Anything else you wish to address, sir?

MR. WOODWARD:  I don't think so, Your Honor.

THE COURT:  Thank you.

I'll hear from pretrial services.

THE PRETRIAL SERVICES OFFICER:  Your Honor, this case is supervised by Christine Schuck, who has been in

communication with the supervising officer in the Eastern District of Virginia.  So I cannot comment on the defense counsel's comments that there's a level of contempt in reference to his client.  What I can comment on are basic conditions of release.

And the first being, we do not -- in the D.C. area or any other jurisdiction -- grant individuals approval when they're on home confinement to go for a jog, because that's not part of what they can do when they're on home confinement.

In reference to the errands, when someone calls and they tell us where they want to go, we usually look at how far it is away from their house, how many stops.  If it's, you know, getting a haircut, we know that that might be awhile.  So we calculate the time by that.  So if he asked for three hours and she only gave him two, that's common practice.  I do that as well for defendants.

In reference to -- and I will just note that on page 2 of the report, it says on Saturday, May 29th, the defendant became intoxicated at his mother's residence and was unable to arrive home until about 9:00 p.m., six hours past his original authorized time.

I did not hear the AUSA say he got drunk with his mother, but pretrial's report clearly states he was consuming alcohol while at his mother's house which prevented him from abiding by his set curfew and returned late, and that is

considered a violation.

And I will note that the beeping that Your Honor has been hearing throughout the session is because the defendant's battery is dying.  So unless he has a charger with him, which I hope he does at his hotel room or in his car, his battery -- the -- the chargers usually start beeping when the battery is at 30 percent, and then it beeps again at 20 percent, and so on, when the battery is dying.  So the beeping Your Honor is hearing is the battery has not been charged properly.

All of the other information is in the report, Your Honor.  I'm sure you've read it.  I won't go over it.  I will just highlight that during the office visit -- looks like it was on August the 11th -- the defendant -- is when the defense counsel said he invoked his Fifth Amendment rights not to cooperate with the pretrial officer and answer any questions that he was being asked.

THE COURT:  All right.  Thank you, ma'am.

Ms. Bond, are you handling this?

MS. BOND:  I am, Your Honor.

THE COURT:  So I think what we should do, if you want to pursue this, is to file a motion.  And sounds like you probably need a witness to -- sounds like some of these facts are contested.  So I guess I'm inclined to put the defendant on the release conditions in the other case; put them on here, and then leave it to you if you want to pursue this further.

MS. BOND:  Thank you, Your Honor.  Will do.

THE COURT:  So, Mr. Klein, if you can stand, please.

Sir, I'm going to be ordering you on release conditions in this case identical to those that you are facing in -- or -- or are under in your prior case.  We'll have you sign something here in a moment once we have a next court date.

So I am directing you to come to court on the next date.  You do not have the option to waive your presence.  And I can only say if it does come to sentencing in this case -- and perhaps it will not, but if it does, I certainly do take a defendant's pretrial release conduct into account, and you're kind of starting out behind the eight ball on this with me.

So regardless of whether or not the government decides to file a motion to revoke, I just encourage you to make sure you're scrupulously complying with the release conditions and, you know, I -- I don't know this pretrial services -- or probation officer, but it's -- it's your responsibility to make it work, not that -- that officer's.

All right.  Thank you.  You may sit down.

MR. WOODWARD:  Judge, I think the first case remains open.  This has not been dismissed by the government or otherwise administratively closed by the Court.

THE COURT:  Okay.  Do you have a motion?

MS. BOND:  Your Honor, we don't have a motion at this time.  We're asking -- we specifically would like to file a

motion to address that, Your Honor.

THE COURT:  I think you probably need to file something.  And, frankly, it's from Judge Bates.  So I'm not sure that I can do it anyway.  So I'll just ask you-all to -- to talk with him and -- I don't think I have that case; correct?

MS. BOND:  Correct.  It is Judge Bates.

MR. WOODWARD:  It has been transferred.

THE COURT:  It has been transferred to me?  Okay.  So I'll ask you to file a motion.

MS. BOND:  Thank you, Your Honor.

THE COURT:  Thanks.

All right.  I do think it's appropriate for us to come back in about 60 days.  I know most defendants have agreed to toll the speedy trial clock.  Those that have not, nonetheless, I am going to toll the speedy trial clock.  I think this is regardless what -- I think about other cases, this strikes me as a complicated case with a number of defendants, co-defendants, and a lot of moving parts that are going to require the government, the Court, and the defendants' attorneys time to get up to speed.

I think it is appropriate to -- to toll the speedy trial clock, and I find that the interests of justice outweigh the interests of the defendant and the public to the extent that it makes sense to toll until the next status hearing.

What I'm going to propose is on December 10th at 2:00 p.m.  It would be in person, but I'm -- as I said, most defendants can -- can waive their presence.  Please raise your right hand if that time does not work for you.  2:00 p.m. on December 10th.  Does not.

Oh, my goodness.  Did this work the very first time?

Okay.  Speak now or forever -- yes.

Am I correct that most defendants are going to want to waive their presence?  So I think we can go back to our courtroom.  Okay.  So we'll set this for a continued status conference on December 10th at 2:00 p.m.

And as I said, I'm -- I'm tolling the speedy trial clock until then.

MR. METCALF:  Your Honor, if I may be heard.  It's a date that Mr. McBride is not going to be able to do on that day.  Is there any chance that it can be either before -- before the 8th or to the following week?  I apologize.

THE COURT:  Okay.

MR. METCALF:  That afternoon is the only time during that week that is -- that he is not available.  So that's why.

THE COURT:  How about the following Friday?  Friday, December 17th at 2:00 p.m.  Raise your hand if that does not work for you.  Going once.  Going twice.

Okay.  So we'll set for a pretrial -- I'm sorry -- status conference on Friday, December 17th at 2:00 p.m.

I'll be looking to the government to help me with some, kind of, clear direction from where we're going there.

Ms. Jackson, anything we should be discussing today?

MS. JACKSON:  No, Your Honor.

THE COURT:  All right.  Mr. Klein, step forward, please.

THE COURTROOM DEPUTY:  If you can please raise your right hand.

(Oath administered to Mr. Federico Klein.)

DEFENDANT KLEIN:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  And, Mr. Klein, come on over here.  We'll need you to sign something.

All right.  Anybody think there are any issues that I did not address today that I should have addressed?

Okay.  Thanks, folks.  See you in a couple months.

(Proceedings were concluded at 6:09 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


          I, Nancy J. Meyer, Registered Diplomate Reporter,

Certified Realtime Reporter, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of my

stenograph notes and is a full, true, and complete transcript

of the proceedings to the best of my ability.


                         Dated this 6th day of October, 2021.


                         /s/ Nancy J. Meyer
                         Nancy J. Meyer
                         Official Court Reporter
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         333 Constitution Avenue Northwest
                         Washington, D.C. 20001