**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-40-TNM-7** |
| **DAVID MEHAFFIE** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence David Mehaffie to 64 months of incarceration, three years of supervised release, restitution in the amount of $2000, and a special assessment of $220.  This sentence falls at the mid-point of the defendant's Sentencing Guidelines range of 57-71 months and balances the factors articulated in 18 U.S.C. § 3553.

## I.    INTRODUCTION

From an elevated position at the center of the violence, chaos, and destruction on January 6, 2021, Mehaffie participated in the attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]   On that day, Mehaffie led

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United

rioters in a sustained onslaught against the law enforcement officers who were guarding the Lower West Terrace ("LWT") tunnel entrance.   For twenty-six minutes, Mehaffie stood on his perch giving orders, directing movements, and coordinating the efforts of the mob, increasing the amount of violence in the tunnel and increasing the danger to the officers inside.   During those twenty-six minutes, as Mehaffie advised rioters to "push" and coordinate their movements by going "in this way, out this way," officers inside the tunnel were fighting for their lives:   they were struck with their own weapons, sprayed with chemicals, pushed, shoved, crushed, and treated with contempt by those intent on violence.   Assuming a position of authority over the rioters, David Mehaffie led the attack.

Mehaffie's conduct in aiding and abetting other rioters on January 6, 2021, put numerous officers at risk of severe harm and made the violent mob seeking to interrupt the certification of the 2020 Electoral College vote more efficient.   His encouragement and direction to other rioters heightened the danger to law enforcement, many of whom were injured – both physically and otherwise – in the course of the day.   For his conduct, the government asks that the Court sentence Mehaffie to a sentence of 64 months of incarceration, which is at the mid-point of the Sentencing Guidelines calculation of 57-71 months.   A 64-month sentence reflects the severity of Mehaffie's conduct, his leadership role in enhancing the violence directed at police officers, his unwillingness to take full responsibility for his actions, and the way in which he "shaded" his trial testimony to justify his conduct.

---

States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters – Mehaffie among them – descended upon the U.S.

Capitol building and grounds in an effort to disrupt the peaceful transfer of power after the

November 3, 2020, presidential election. Many rioters attacked and injured police officers, some

with dangerous weapons; they terrified congressional staff and others on scene that day, many of

whom fled for their safety or sheltered inside their offices and even in the House Chamber; and

they ransacked a historic building—vandalizing, damaging, and stealing artwork, furniture, and

other property. Although the facts and circumstances surrounding the actions of each rioter who

breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed,

directly or indirectly, to the violence and destruction that day.

During trial, the Court heard testimony regarding the joint session of Congress that was in

progress on that date, the vote count of the Electoral College, as well as the initial breach of the

Capitol by the mob and the consequences of that breach.   For additional background, the United

States hereby incorporates by reference the trial testimony of U.S. Capitol Police Captain Ronald

Ortega, the stipulated testimony of Lanelle Hawa from the United States Secret Service, and the

stipulated testimony of Daniel Schwager, the general counsel to the secretary of the United States

Senate.  *See* Trial Tr. 8/29/22 at 16-17, 21-112; Trial Exs. 2, 705-09, 1000, & 1001.

### B.      West Front:   Attempted Breach and Assaultive Conduct

Assaults against law enforcement on the West Front of the Capitol Grounds made the

rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by

the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Gov't Sentencing Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well

as patrolling throughout the grounds.   At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.   Members of the mob ultimately made their way across the west lawn and flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Gov't Sentencing Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Gov't Sentencing Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol, including defendant Mehaffie.   As the court heard during trial, Mehaffie was captured on video standing on the West lawn urging rioters to move forward toward the Capitol building.   *See* Gov't Sentencing Ex. 4 (video).   As the crowd swells behind him at the foot of the Lower West Terrace, Mehaffie can be seen shouting to those hesitating to step on to Capitol grounds, saying "If we can't fight over this wall, we can't win this battle!   Come on!" *Id*.

At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd using a long-range acoustic device

(LRAD).   It began with two blaring tones, and then a 30-second announcement, which was played

on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members

of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee

and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the

front of the inauguration stage were flanked, outnumbered, and under continuous assault from the

thousands of rioters directly in front of them as well as members of the mob who had climbed up

onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because

many of the thousands of people surrounding the officers were not engaged in assaultive conduct,

it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm,

with their situation untenable and openings in the perimeter having already led to breaches of the

building, several large gaps appeared in the police defensive line at the West Front; officers were

ultimately overwhelmed, the police line collapsed, and rioters flooded onto the Lower West

Terrace.   As officers struggled to find a safe location to establish a new police line, a general

retreat was called.   With their defensive lines extinguished, police officers were surrounded by

the crowd and rioters seized control of the Lower West Terrace and the inauguration stage.   There

were now no manned defenses between the crowd and several entrances into the United States

Capitol Building, allowing the stream of rioters that had started entering the building around 2:13

p.m. to build to a torrent.





*Gov't Sentencing Exhibit 5: Breakthroughs in the defensive line on both the left and right flanks (top photo) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### C.   Assaultive Conduct in the Lower West Terrace Tunnel

During trial, the Court heard first-hand accounts – and watched video after video – showing how brutal the violence in the LWT tunnel was as thousands of rioters directed sustained efforts to forcing their way through that tunnel entrance over a period of hours.   On January 6, 2021, when rioters arrived at double glass doors protecting the tunnel entrance, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:40 p.m., David Mehaffie was among the first group of rioters to enter the tunnel and to approach the double doors.   *See* Gov't Sentencing Ex. 7 (video), USCP CCTV

Footage at 2:40 p.m.   At approximately 2:42 p.m., as Mehaffie stood by, another rioter broke a window to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to advance.   See Gov't Sentencing Ex. 8 (video), Sgt. Bogner BWC at 2:41 p.m.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Mehaffie, who was at the front of the line of rioters who first made contact with officers, appeared to put his hands in the air as other rioters physically engaged with the line of officers.   *See* Gov't Sentencing Ex. 9 (video) and Gov't Sentencing Ex. 10 (video), Cantwell Videos.

Officers then created a line in the doorway to block the rioters and also engaged them with batons and OC spray.   At a later hearing on the events of January 6, Representative Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges before the House Select Congressional Committee.   As the Court heard directly from Officer Hodges during trial, he was crushed and struck while caught in the tunnel doors between the rioters and the officers.   Officer Hodges' presence in the tunnel – and the presence of all of the officers protecting the tunnel entrance that day – had a direct effect on Rep. Murphy as she later related:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you [Officer Hodges] know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from

that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone after being dragged out of the tunnel and the assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing

as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

**D.      David Mehaffie Led the Onslaught in the Lower West Terrace Tunnel**

David Mehaffie stepped up as a leader on January 6, 2021.   He led the charge in bringing the mob toe-to-toe with the line of officers protecting the tunnel entrance.   He was among the first group of people to enter the tunnel as officers retreated following the collapse of the police line on the Lower West Terrace.   He was one of the first rioters to bang on the glass doors as the officers inside prepared to defend the Capitol Building.   He stood by watching as another rioter broke through the glass doors barring the way to the frightened representatives and staffers inside.   He then took command and aided the rioters in effectively wielding the force of the mob against the valiant – and increasingly exhausted – officers desperately trying to hold the line inside.

For the twenty-six minutes that Mehaffie perched himself at the tunnel entrance he was, in every sense of the word, a leader.   He directed.   He coordinated.   He commanded.   He assisted. He encouraged.   Everything that one would expect of a good leader, David Mehaffie stepped up. For those twenty-six minutes, he led the rioters in a coordinated attack on officers, resulting in untold injuries and a lifetime of terrifying memories for the officers who faced down the mob.

Defendant Mehaffie's participation in the riot began as he stood on the restricted grounds of the West Lawn urging other rioters forward toward the Capitol, shouting "If we can't fight over this wall, we can't win this battle.   Come on!"   Gov't Sentencing Ex. 4 (Video).   Once rioters overwhelmed the police line on the Lower West Terrace at approximately 2:28 p.m., Mehaffie

made his way through the crowd, up to the inaugural stage, and directly toward the tunnel where

dozens of police officers had retreated only moments earlier.   By 2:40 p.m., Mehaffie was part of

the first group of rioters to enter the tunnel and to bring the mob to the threshold of the Capitol.



**Gov't Sentencing Ex. 11:**   *Mehaffie enters the tunnel with the first group of rioters at 2:40 PM*

Once inside of the tunnel, Mehaffie walked through the crowd and directly up to the outer set of

glass doors within the tunnel.   There, he began banging on the glass door as the officers on the

other side prepared for the onslaught.   Gov't Sentencing Ex. 8 (video).



*Gov't Sentencing Exhibit. 8.1:*   Still of BWC from Sgt. William Bogner at 2:41 PM

Moments later, another rioter broke the outer glass door as Mehaffie stood by.   Gov't Sentencing Ex. 8 (video).   Without hesitating, Mehaffie entered through the outer – now broken – set of glass doors, opened the inner set of glass doors, and held the door open as other rioters walked directly up to the officers inside.   At that point, the line of officers was face-to-face with the throng of rioters, with Mehaffie holding the door wide open.   Gov't Sentencing Ex. 9 (video) and Sentencing Ex. 10 (video).   As the rioters confronted the police line, some members of the mob immediately became violent.   Although Mehaffie was at the front of the line, he did not personally engage in physical violence.   Instead, in the first few moments when rioters began their hours-long physical assault on law enforcement, Mehaffie held his arms up in the air.

15












***Gov't Sentencing Ex. 12:*** *Mehaffie enters outer broken glass doors, holds open inner glass door for rioters, and later raises his arms*

Mehaffie was not only engaged in the violent effort to push through the line of officers, he chose to lead that effort.   By 2:52 p.m., Mehaffie made his way from the front of the line of rioters near the doors to a position where he could better command the mob, taking his place on an elevated platform at the entrance to the tunnel.   From that platform – where Mehaffie stood and took command for 26 minutes – he had a clear view of both the fighting inside the tunnel and the angry mob on the outside of the tunnel, so was perfectly positioned to coordinate the attack on the police line.



*Gov't Sentencing Ex. 13:* *Mehaffie commands the mob from his leadership position at the tunnel entrance*

Between 2:52 and 3:18 p.m., as Mehaffie commanded the mob from his elevated position, he multiplied the force and channeled the efficiency of that mob by providing leadership, direction, and encouragement.   Without ever directly assaulting an officer with his own hands, Mehaffie's leadership ensured that the mob violence was concentrated directly on the officers who had created a human barricade into the Capitol.   Rather than an undisciplined and uncoordinated mass of violent individuals – which would have been difficult enough for law enforcement to address – Mehaffie's leadership converted that undisciplined mass into a coordinated weapon directed against the officers.   Every blow landed, every weapon used against officers, every push, and every strike was made more effective because of David Mehaffie's direction.

While leading the mob, Mehaffie took a number of different actions to energize and coordinate individual rioters.   From the elevated platform, he repeatedly directed the mob by

waiving, pointing, and gesturing to individuals trying to get in and out of the tunnel.  *See* Gov't

Exs. 14, 15, 16, 17, 18 and 19 (videos).   As the Court found in rendering a verdict on Count 12,

"Upon review of the entire video, [Trial Exhibit 101.2] I count at least 12 times where he gestured

rioters into the tunnel."   *Trial Transcript, McCaughey, Oral Ruling*, 9/13/22 at 33.   The

defendant also "helped pass a shield to the rioters at the other end of the tunnel, thereby actively

assisting their continued interference."   *Id.*   As the Court concluded,

> Mr. Mehaffie's gestures coincided with attacks on the officers, he directed rioters
> into the tunnel at 2:56 p.m.   According to Sergeant Bogner's body-worn camera,
> rioters further into the tunnel were at the same time pressed against police.   This
> happened at 3:12 p.m., when Mr. Mehaffie waved in rioters while those in the
> tunnel engaged in a coordinated push against the police line…The simultaneous
> addition of more rioters at Mr. Mehaffie's direction helped that interference with
> police officers.

*Id.* at 33-34.

While Mehaffie directed rioters from the tunnel entrance, he saw other rioters engaging in

numerous acts of violence against law enforcement inside of the tunnel including:   spraying the

police with chemical agents, striking police with hands and fists, flagpoles, batons, and similar

items, throwing dangerous objects – including poles, bottles, plastic boxes, and even a firecracker

– at police; spitting at police; flashing a strobe light in their eyes; and using stolen riot shields as

weapons against police.   On several occasions during that period, rioters in the tunnel combined

their collective bodyweight and coordinated their efforts by repeatedly pushing as a group against

the police in an effort to force their way through the line while collectively shouting "Heave ho!"

See Gov't Sentencing Ex. 20 and Gov't Sentencing Ex. 21 (videos).

One of the most notable instances in which Mehaffie's leadership had devastating consequences for the officers inside of the tunnel took place between approximately 3:11 and 3:12 p.m. At around 3:11 p.m., the rioters inside of the tunnel began a heave-ho push, using their collective bodyweight to push against the line of officers.   At approximately 3:12 p.m, as the heave-ho effort continued with the tunnel only partially full, Mehaffie began waiving his arm to the crowd outside to encourage them to enter the tunnel.   At his command, rioters rushed into the tunnel to fill the void, adding additional bodyweight to the mass push.   During these same moments, MPD Officer Daniel Hodges was at the front of the police line, with his body pinned between a metal door frame and a riot shield wielded by one of Mehaffie's codefendants.   As he testified at trial:

> The attackers are trying to break through our defenses and make their way into the Capitol. I'm pinned to the door frame on my right by the force of the attackers and the riot shield. And someone -- as I'm pinned, my arms are functionally useless. I can't move them. And I'm pinned in such a position that I can't get any functional strength from my legs. So I was very vulnerable at that moment.   Someone in the crowd, taking advantage of that moment of my vulnerability, started trying to pull on my face, my gas mask, trying to rip it off my head and injuring my neck.

*Trial Transcript*, *McCaughey*, 8/30/33 at 200.   He further explained the impact that the force of the mass push had on him personally:

> The pressure from the crowd was not entirely on me, as you can see the police line going back and forth as well. But as I was at the front of the line and the person holding the shield was at the front of their line, a lot of that pressure was being focused onto me, creating my moment of vulnerability and causing me pain in that moment. And as you play the video, it gets worse.

> [Question omitted].

> I can't really put a number on it [the pain] or anything like that. But I know that it
> was significant enough to contribute to my injuries of the day and contributing to
> my mental state and the -- my ability to perform my duties and to repel the attackers.

*Id.* at 201.   The extra weight focused on Officer Hodges by the mass of rioters waived into the

tunnel between 3:11 and 3:12 p.m. is directly attributable to Mehaffie's conduct.

Not only did Mehaffie make the rioter's assaults more effective, he also helped to

coordinate the rotation of tired rioters out of the tunnel and encouraged new rioters to replace them,

allowing the mob to sustain a full roster of eager, energized and angry rioters at the front of the

line.   As a former gym owner and trainer, Mehaffie's personal charism and ability to motivate

others served him well in his efforts to direct the crowd.   In one video, Mehaffie shouted to the

crowd, "If you are going in, get on this side!" while pointing to the right side of the tunnel.   He

then shouted to the crowd, "In on this side, out on this side!   In on this side, out on this side!"   As

he shouted, he pointed "in" toward the right side of the tunnel and gestures "out" on the left side

of the tunnel.   *See* Gov't Sentencing Ex. 22 (video).   In contrast to the seemingly infinite number

of rioters, the officers inside of the tunnel numbered only in the dozens, making it impossible to

sustain "fresh" officers at the front of the line and leading to an increasingly exhausted, battered,

and bruised pool of officers stationed inside.

Mehaffie remained in his leadership position until approximately 3:18 p.m. when law

enforcement temporarily pushed the mob back out of the tunnel and onto the terrace.   Instead of

stepping down as the officers reclaimed the tunnel, Mehaffie remained in his position and

physically resisted the officers' efforts.   Only after multiple attempts by officers to force him from

his position did Mehaffie finally give up command of the tunnel.   See Gov't Sentencing Ex. 23.

### E.       Mehaffie "Shaded" His Trial Testimony

At trial, Mehaffie admitted to much of what was depicted in the videos, but "shaded" his

testimony in important respects.   *Trial Transcript, McCaughey, Oral Ruling*, 9/13/22 at 6.   As

the Court noted:

> The other witnesses, Ms. Mehaffie, Mr. Mehaffie, and Mr. McCaughey, each had
> a significant stake in the outcome here.   And while I do credit much of their
> testimony, where their testimony conflicts with my findings below, I think that is
> because they shaded their testimony to be more favorable to their case than the facts
> allowed.

*Id*.   Specifically, Mehaffie testified at trial that he directed rioters at the mouth of the tunnel for

the purpose of ensuring the safety of those inside. The court only partially credited his testimony

on this, specifically finding:

> The fifth element requires him to act with the intent that others commit the offense.
> Mr. Mehaffie argues that he intended to keep people safe. During his testimony, he
> recounted how a friend of his had been injured at a The Who concert in the 1970s
> because a number of concertgoers got stuck between locked doors and the crush of
> the crowd behind them.
>
> Mr. Mehaffie said that on January 6th, he grew panicked and fearful that another
> crush might happen unless he directed traffic into and out of the tunnel; thus, he
> told rioters on which side of the tunnel to enter and on which side to exit. He did
> not intend for anyone to get hurt, according to him.
>
> I credit that Mr. Mehaffie grew panicked during the initial moments, given his
> knowledge of the concert and his own experience in the tunnel. However, I think
> he overstates the extent to which this initial experience and recollection directed his
> subsequent activities. The risk of a crush increases with more people, yet Mr.
> Mehaffie continued to direct more people into the tunnel. And his own words at the
> time prove that he did so to continue the interference with the police officers. Just
> after taking his position above the fray, Mr. Mehaffie yelled to those below, "We
> don't hurt them; we push" at Exhibit 301 at one minute and 23 seconds.
>
> Seconds later, he tells the same group to "Push" again, at two minutes and nine
> seconds. He more than most would know from The Who concert that pushing in a
> confined space is actually quite dangerous to all involved. He also helped pass a

shield forward in the crowd, an action that is inconsistent with his purported motives and one that he rightly admitted he now regrets. From all of these actions, I conclude that even if he wanted to minimize injuries to protesters, he still wanted those entering the tunnel to continue their disruptive efforts against the police. These two intentions not mutually exclusive.

*Trial Transcript, McCaughey, Oral Ruling*, 9/13/22 at 34-35.

Mehaffie's leadership role at the mouth of the tunnel was instrumental in enabling the rioters to effectively sustain the onslaught against the police between 2:52 and 3:18 p.m. and his sentence should reflect that leadership role.

### F.  Injuries Sustained in the Tunnel

During trial, the court heard from numerous officers about the broad array of injuries they suffered in and around the time that Mehaffie was leading rioters from the mouth of the tunnel. Most notably, MPD Officer Daniel Hodges testified about his experience being assaulted by co-defendant Patrick McCaughey at approximately the same time that Mehaffie was encouraging rioters to participate in a "heave-ho" and to amass their weight against the police line.   With respect to Hodges' injuries, the Court found that:

> Mr. McCaughey's use of the shield caused him significant pain, specifically in his lungs, his head and his face, that it crushed him and its hard surface prevented him from fighting against the assault and that he screamed out in part in pain because of Mr. McCaughey's actions against him. I also credit Officer Hodges's claim to have suffered large bruises and pain all over his body, and believe those injuries were in part caused by Mr. McCaughey's actions.

*Trial Transcript, McCaughey, Oral Ruling*, 9/13/22 at 23-24.   While the experience of Officer Hodges was particularly visible in light of the video recording of the specific assault he endured, he was not the only officer injured in the tunnel between 2:52 and 3:18 p.m.   For purposes of assessing the defendant's role in causing injury, Officer Hodges's injuries are only offered as a

single example of the injuries facilitated by defendant Mehaffie and not as the totality of all injuries facilitated by the defendant during the offense.

### III.   THE CHARGES

On December 1, 2021, a federal grand jury returned a fifth superseding indictment charging Mehaffie with five counts, including:   Count 12, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. 111(a) and 2; Count 34, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. 1512(c)(2) and 2; Count 35, Civil Disorder, in violation of 18 U.S.C. 231(a)(3); Count 52, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. 5104(e)(2)(D) and 18 U.S.C. 2; and Count 53, Act of Physical Violence in the Capitol Grounds, in violation of 40 U.S.C. 5104(e)(2)(F) and 18 U.S.C. 2.   The charges against defendant Mehaffie were part of a larger 52-count indictment charging a total of nine codefendants.   Following a bench trial, which included codefendants Patrick McCaughey, Tristan Stevens, and David Mehaffie, the Court found Mehaffie guilty of Counts 12, 35, 52, and 53.   The Court acquitted defendant Mehaffie of Count 34.

### IV.   STATUTORY PENALTIES

Defendant Mehaffie now faces sentencing for Counts 12, 35, 52, and 53.   Count 12, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting (Class C Felony), carries a maximum penalty of 8 years of incarceration, while Count 35, Civil Disorder, carries a maximum penalty of 5 years of incarceration (Class D Felony).   Counts 12 and 35 also carry a term of supervised release of not more than three years, a fine of up to $250,000, and a special assessment of $100 per count.   Counts 52 and 53 carry a maximum term of imprisonment of 6

months of incarceration, up to five years of probation, a maximum fine of $5000, and a special assessment of $10 per count.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   In this case, U.S.S.G. §2A2.4 is the applicable starting guideline.   However, the cross-reference of §2A2.4(c) applies here because the conduct in question constitutes "aggravated assault."   The term "aggravated assault" is defined in §2A2.2 as "a felonious assault that involved…or (D) an intent to commit another felony."   At the conclusion of trial, the court found defendant Mehaffie guilty of committing Count 12 with the intent to commit another felony, namely Civil Disorder, in violation of 18 U.S.C. 231(a)(3), as charged in Count 35.   Specifically, the court ruled:

> I also specifically find that he and those he was aiding and abetting were acting with the intent to commit civil disorder. I therefore find Mr. Mehaffie guilty on Count 24 of aiding and abetting a felony violation of Section 111(a).

*Trial Transcript, McCaughey, Oral Ruling*, 9/13/22 at 36.   Thus, Count 12 is an "aggravated assault" because it was committed with the intent to commit another felony.   For this reason, the base offense level should be determined using U.S.S.G. §2A2.2.

U.S.S.G. § 2A2.2(b)(3) also applies here because multiple officers were injured inside of the Lower West Terrace Tunnel during the time period in which defendant Mehaffie aided and abetted other rioters in assaulting law enforcement.   Specifically, Officer Daniel Hodges testified at trial that he was injured while inside of the tunnel and described the extent of his injuries.   The

U.S.S.G. defines "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."

Finally, Mehaffie's leadership role in directing rioters in the tunnel for 26 minutes is an aggravating factor which increases his overall score under U.S.S.G. § 3B1.1(c).[2]   Therefore, the following Guideline's analysis applies:

Count 12: 18 U.S.C. § 111(a)(1) and 2 (aggravated assault, aiding and abetting)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3B1.1(c) | Leadership Role | +2 |
| | **Total for Count 12** | **25** |

As with Count 12, U.S.S.G. §2A2.4 is the applicable starting guideline for Count 35 but, again, the cross-reference of §2A2.4(c) applies because the conduct in question constitutes "aggravated assault."   The term "aggravated assault" is defined in § 2A2.2 as "a felonious assault that involved…or (D) an intent to commit another felony."   The United States submits that the calculation for Count 35 should mirror that of Count 12:

Count 35: 18 U.S.C. § 231(a)(3) and (Civil Disorder)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3B1.1(c) | Leadership Role | +2 |
| | **Total for Count 35** | **25** |

---

[2] The United States notes that the Pre-Sentence Report does not include the aggravating factor for leadership under U.S.S.G. § 3B1.1(c) but contends that this factor should be applied based upon Mehaffie's role in directing others in and around the tunnel on January 6, 2021.

Because Counts 12 and 35 involve the same set of victims and the same act or transaction, they group under U.S.S.G. § 3D1.2(a).   Counts 52 and 53, both Class D misdemeanors, do not carry a sentencing guidelines range.   Thus, after grouping Counts 12 and 35 the Total Offense level for both counts is of 25.   Mehaffie has no criminal history, and so is in Criminal History Category I, resulting in sentencing range of 57-71 months of incarceration.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

Mehaffie's leadership role in aiding and abetting other rioters on January 6, 2021, put numerous officers at risk of severe harm and gave momentum to a violent mob seeking to interrupt the certification of the 2020 Electoral College vote.   His encouragement and direction to other rioters heightened the danger to law enforcement, more than a hundred of whom were injured in the course of the day, and ultimately threatened the peaceful transfer of power.   The nature and circumstances of the offense fully support the government's recommended sentence of 64 months.

### B.  The History and Characteristics of the Defendant

Defendant Mehaffie is an individual with a long history of engaging in lawful protests on issues important to him.   Those peaceful protests are Constitutionally protected and are an essential part of sustaining a functioning democracy.   Nevertheless, Mehaffie's experience in protesting has given him a first-hand view of the clear line between lawful protesting and unlawful activity.   As described in his testimony and confirmed in the Pre-Sentence Report, Mehaffie has

been arrested in the past when his lawful protesting spilled into unlawful conduct; he has also been the subject of a civil suit related to his protesting activity.

This history as an experienced protester is significant to understanding Mehaffie's actions on January 6, 2021.   He was not a novice.   His actions were not the product of youthful inexperience.   His actions were those of a man who understood the mechanics of leading a crowd during a protest, who understood the clear line between a peaceful protest and unlawful activity, and who still made the choice to engage in that unlawful activity.   Mehaffie's history as a seasoned and knowledgeable protestor – one with leadership experience within those protests – strongly supports the government's request for a middle of the Guidelines sentence of 64 months of incarceration.

In addition to his protest experience, Mehaffie was also the owner of a gym who physically trained other individuals for a living.   His income depended on his charisma and ability to inspire and motivate people to work harder and reach within themselves.   These personal characteristic provide some explanation of why – out of thousands of rioters – it was Mehaffie who took charge by climbing on the tunnel archway and why – out of thousands of rioters – other people actually listened and followed his lead.

David Mehaffie knew what he was doing when he took command of the rioters in the tunnel, and he knew what those rioters were doing to the police.   He knew the import of leadership on the efficacy of a crowd, he understood the line between peaceful protest and violence, and he nevertheless made the deliberate choice to use his experience to lead the crowd in opposing law enforcement through violence.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Mehaffie's criminal conduct in leading and encouraging rioters for twenty-six minutes as they engaged in a sustained onslaught against law enforcement was highly dangerous, increased the violence and volatility of the tunnel, and ultimately disrupted the Congressional proceedings inside of the building.   His actions demonstrated a disregard for the safety of the officers subject to the mob inside of the tunnel and was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Violence of the kind Mehaffie facilitated cannot become a quadrennial tradition.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration because, as of trial, Mehaffie still had not come to terms with his own actions.   The government recognizes that, at trial, Mehaffie

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

acknowledged entering Capitol grounds and the specific physical conduct that he engaged in inside of the tunnel.    What the defendant has not fully acknowledged is *why* he engaged in that conduct, strongly suggesting that deterrence is necessary.    At trial, Mehaffie clearly "shaded" his motives for participating in the riot, attempting to portray himself someone trying to protect others and to minimize the violence.    *Trial Transcript, McCaughey, Oral Ruling*, 9/13/22 at 6.    This portrayal simply is not consistent with the evidence.    Further, while Mehaffie has expressed regret for some of his conduct – such as passing a riot shield forward into the tunnel – he has not expressed any remorse for the remainder of the destruction that he encouraged while in command of the tunnel. His testimony at trial focused on the bad actions of others and his disapproval of what others were doing but failed to demonstrate any remorse for his own destructive conduct.

Mehaffie's unwillingness to recognize the extent of the harm he caused on January 6th suggests that he does not yet grasp that he engaged in wrongdoing.    He sees himself as a protector, not as an offender.    It follows that, if he is unable to fully acknowledge his own wrongdoing, he will not be deterred from similar future conduct without a significant external constraint, such as a lengthy prison term.    Mehaffie's past conduct with respect to crossing the line from peaceful protest to unlawful conduct bears this out.    His prior arrests and a civil lawsuit were not enough to deter him from making the leap from lawful protest to unlawful conduct on January 6th, and the government has no confidence that anything short of incarceration will deter him from crossing that line again in the future.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

*States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mattice*, 21-cr-657, Chief Judge Beryl Howell sentenced each defendant to forty-four months of incarceration following their convictions pursuant to 18 U.S.C. 111(a). Mattice and Mault traveled to Washington D.C. on January 6th and anticipated violence. During the riot, Mattice recorded Mault as Mault encouraged police officers to stand aside and allow the rioters to invade the Capitol Building while it was still occupied by Members of Congress. When the vastly outnumbered officers refused to give way, Mattice pulled down a section of bike rack fencing separating the officers from the crowd. Then Mattice and Mault led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. During this conflict, Mattice got chemical spray in his eyes; he took a break from the fight to wash out his

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

eyes.   Later, he rejoined the fight, traveling to the Lower West Terrace, climbing over other rioters to reach the mouth of the Lower West Terrace tunnel, and using a chemical spray against the police officers who refused to yield to the mob. The officers already had endured more than an hour of violent attacks before Mattice assaulted them and helped others assault them.   Similar to defendant Mehaffie, both Mattice and Mault participated in the violence on the West side of the Capitol as rioters made their way to the Lower West Terrace tunnel.   They also led and encouraged other rioters engaged in violence against police that day.   However, unlike defendant Mehaffie, both Mattice and Mault ultimately accepted full responsibility for their action by entering guilty pleas and received a reduction in their total Sentencing Guidelines score.

Similarly, in *United States v. Richardson*, 21-cr-721, Judge Kollar-Kotelly sentenced defendant Howard Richardson to 46 months of incarceration after he entered a guilty plea to a single count of 18 U.S.C. 111(a).   During the riot Richardson joined the storming of the police line on the West Terrace just in front of the media tower that had been constructed ahead of the Presidential Inauguration. He brought a metal flagpole with him to the Capitol that day. At around 1:38 p.m., as he stood at the very front of the line of police officers struggling to maintain their position and hold the mob back, Richardson used his metal pole to strike a police officer three times, stopping only when the metal pole broke in his hands. Then, moments later, he helped a group of rioters force a very large metal billboard into the same line of besieged officers. Although he was pepper sprayed at least two times in short order, Richardson remained on the Capitol grounds until around 3:10 p.m.

34

Finally, in *United States v. Miller,* 21-cr-75, the defendant was sentenced by Judge Randolph Moss to a total of 33 months of incarceration after entering a plea to one count of 18 U.S.C. 1512(c)(2) and 2 (Obstruction of an Official Proceeding) and one count of 18 U.S.C. 111(a). In that case, after watching other rioters repeatedly assaulting law enforcement officers in the Lower West Terrance entrance to the Capitol, Miller chose to join in by encouraging rioters to push against the police lines erected to keep members of the mob from entering, and then unleashing the contents of a fire extinguisher directly onto officers in the Lower West Terrace tunnel.

In each of the cases described above, rioters were sentenced – at least in part – for violations of 18 U.S.C. 111(a) that occurred in the midst of the violence that occurred on the West side of the Capitol.   While there are no identical factual scenarios, these cases provide guidance as to the appropriate range for convictions under this statute in the context of the violence on January 6th.[5]

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness

---

[5]  A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[6]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[7]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress

---

[6] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[7] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[8]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in

---

[8] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.  Here, the Court should find that Mehaffie's conduct in directing rioters who were forcibly attempting to breach the police line and to enter the Capitol building caused damage to that building.

18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[9]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Mehaffie to pay $2,000 in restitution for his convictions on Counts 12, 35, 52, and 53. The breach of the Capitol ultimately resulted in more than 2.8 million dollars in losses and a $2,000 fine fairly reflects Mehaffie's role in the offense and the damages resulting from his conduct. Notably, in addition to his role at the tunnel archway, Mehaffie stood by as another rioter broke the outer glass doors in the tunnel and then was the first to walk through the broken door as other rioters followed.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 64 months of incarceration, three years of supervised release, restitution in the amount of $2000, and a special assessment of $220.   This sentence falls at the midpoint of the defendant's Sentencing Guidelines range of 57-71 months and appropriately balances the factors articulated in 18 U.S.C. § 3553.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     _/s/ Jocelyn Bond_____
JOCELYN BOND
Assistant United States Attorney
DC Bar No. 1008904
U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C.
202-809-0793
Jocelyn.Bond@usdoj.gov